# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CAREY WONG,

        Plaintiff,                  CIVIL ACTION NO. 2:07-10089

vs.

                                     DISTRICT JUDGE DENISE PAGE HOOD

COMMISSIONER OF                  MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that Defendant's Motion for Summary Judgment be GRANTED, that Plaintiff's Motion for Summary Judgment be DENIED, and that Plaintiff's Complaint be DISMISSED, as there is substantial evidence in the record that Plaintiff remains capable of performing a significant number of jobs in the economy.

\*\*\*

Plaintiff filed an application for Supplemental Security Income on July 3, 2003, alleging that she had been disabled and unable to work since May 2, 1998 due to injury to her right arm and hand. (TR 64, 67, 69). The Social Security Administration denied benefits. (TR 46). A requested *de novo* hearing was held on June 30, 2005 before Administrative Law Judge (ALJ) Henry Perez Jr. who subsequently found that the claimant was not entitled to Supplemental Security Income because she was not under a disability at any time through the date of his decision, November 14, 2005. (TR 24-30). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 5). The parties filed Motions for Summary Judgment and the

issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was thirty-three years old at the time of the administrative hearing and worked as a waitress from 1989 through 1993. (TR 70, 238, 240). Plaintiff has not engaged in any substantial gainful activity since 1993. (TR 24). Plaintiff testified that she completed "eleven grades" of education yet indicated on the Disability Report that she completed 12 grades. (TR 75, 85, 238). Based on the Disability Report, the ALJ determined that Plaintiff has a high school education. (TR 29).

Plaintiff sustained injuries to her right arm and hand as a result of a motorcycle accident that took place in Hong Kong on March 5, 1998. (TR 72, 145, 239). Plaintiff was treated at Prince of Wales Hospital, Hong Kong. (TR 74, 145-46). The injury resulted in fractures of the right medial femoral condyle and the right radius and ulna which were fixed operatively with hardware. (TR 145). Plaintiff also sustained injury to the right brachial plexus which resulted in the loss of motor and sensory function of the right upper limb. (TR 145). Plaintiff underwent six surgeries from May 13, 1998 to June 17, 2002 as a result of the injuries, including nerve transfers, fracture fixation, muscle transfer, debridement and skin grafting, tenolysis, plication of tendon transfer and removal of the ulnar plate. (TR 145).

Plaintiff speaks English, however, the record indicates that Plaintiff occasionally needs assistance with translation. (TR 79, 175). An interpreter was available at the Administrative Hearing. (TR 237). Plaintiff testified at the hearing that as a result of the motorcycle accident, she also suffers from back pain so severe that she "cannot go to sleep," injuries to her neck and legs and pain in her knee when it's raining or the weather changes. (TR 239, 241). Plaintiff is right-handed.

(TR 239). Plaintiff testified that she can only use one hand and has to ask other people to assist her. (TR 240). Plaintiff complained of pain in her right arm during the hearing. (TR 240). She also complained of pain in the left shoulder, attributing the pain to overuse of her left hand. (TR 240).

Plaintiff also suffers headaches and notes from May 2005 through June 2005 show that Plaintiff was treated for a migraine headache, depression and radiculopathy in the right upper extremity. (TR 212-14). Plaintiff testified that she still occasionally has migraine headaches and sometimes has vision problems that include seeing flashing lights. (TR 241).

On a Function Report dated August 15, 2003 Plaintiff indicated that she lived with her sister's family but by the June 30, 2005 hearing Plaintiff was living alone. (TR 88, 243). Her sister assists her around the house and does her laundry. (TR 243). Plaintiff wears a plastic cast which was prescribed by her doctor. (TR 93). She noted on the Function Report that she needs assistance with two-handed tasks like tying her shoes, putting her hair up and sometimes dressing. (TR 89, 90). Plaintiff further noted that her memory is "bad." (TR 93). Both Plaintiff and her sister note that Plaintiff used to be outgoing and played volleyball. (TR 92, 100). Now Plaintiff stays home and watches television. (TR 92, 100). Plaintiff does not cook, but she prepares food in the microwave. (TR 246). She states that she can grip things with her left hand but is not sure how much weight she can lift with her left arm. (TR 245). When asked, she indicated that a ten-pound bag of potatoes would be too heavy, but that she could lift a gallon of milk. (TR 247). She testified that due to back pain she can only stand for approximately half an hour, sit for half an hour and walk two city blocks. (TR 245, 247, 248). Walking a long distance gives her back and knee pain. (TR 93). She also testified at the hearing that she cannot drive a car. (TR 243).

The ALJ pointed out at the hearing that on a form dated August 2003, Plaintiff had indicated that she did her own laundry and could drive. (TR 91, 246). Further, on the Third Party Function Report dated August 15, 2003 Plaintiff's sister indicated that Plaintiff can drive and does laundry. (TR 98, 99). Plaintiff clarified that she will "put the soiled clothes into the washer" and then her sister comes over to help her finish the laundry. (TR 246).

## *Medical Record*

In a Medical Report dated January 21, 2003 Dr. P.C. Ho, Senior Medical Officer, Department of Orthopaedics and Traumatology at Prince of Wales Hospital, Hong Kong, noted that at a November 12, 2002 follow-up exam, Plaintiff could extend her right wrist "against gravity with good finger passive flexion produced by tenodesis effect." (TR 145). Dr. Ho further noted "[h]er shoulder could elevate to 90 degree. Elbow flexion power was grade 4 over 5." (TR 145). Dr. Ho concluded that further surgical reconstruction was being contemplated and Plaintiff was requested to follow-up in three months. (TR 145).

In July 2003 Plaintiff was examined by Patrick Wiater, M.D. through the Family Independence Agency. Dr. Wiater diagnosed right brachial plexus injury. (TR 147). Dr. Wiater noted of Plaintiff's right extremity "marked atrophy up and down her arms (sic?) from the deltoid down to intrinsic hand muscles." (TR 147). Dr. Wiater referred Plaintiff to Peter Jebson, M.D., Clinical Assistant Professor, Department of Orthopaedic Surgery. (TR 148-50). In a report dated August 28, 2003 Dr. Jebson noted that Plaintiff stated that she no longer uses her right upper extremity. (TR 149). He further noted that Plaintiff was wearing a forearm orthoplast splint, the arm was in a supinated position and Plaintiff was not on any medications at the time of the examination. (TR 149). Dr. Jebson noted atrophy of Plaintiff's entire upper right extremity

including the forearm and shoulder musculature. (TR 150). He noted that she has "no deltoid function" and "is unable to place her arm up to her mouth and has very limited shoulder function." (TR 150). He noted that "[s]capulothoracic motion appears to be full and painless," "[h]er elbow biceps has 4/5 strength" and "[h]er triceps appears (sic) to be gravity assist only." (TR 150). He noted no ability to extend her fingers and no feeling throughout her right arm. (TR 150). The x-ray of Plaintiff's forearm revealed a healed forearm fracture. (TR 150). Dr. Jebson diagnosed "[r]ight upper extremity panplexopathy with probable root evulsion and history of Horner's syndrome status post multiple neurological procedures with limited function." (TR 150). Dr. Jebson recommended a glenohumeral arthrodesis to stabilize the shoulder and a biceps rerouting to keep the forearm in a pronate position. (TR 150).    Plaintiff was treated by David K. Davis, M.D., physical medicine and rehabilitation, from December 11, 2003 through August 31, 2004. (TR 151-178). Dr. Davis diagnosed Plaintiff as having complete paralysis of the right upper extremity and subluxation of the shoulder and chronic myofascial pain and neurogenic pain. (TR 177). He further noted that Plaintiff "most likely" had reactive depression and that Plaintiff reported a non-restorative sleep pattern. (TR 177). At the December 11, 2003 examination Dr. Davis noted that Plaintiff has a normal tandem gait pattern, she can rise on her heels, toes and squat, and she has normal flexion, extension, rotation and lateral flexion of the lower back without pain. (TR 177). Dr. Davis noted "normal motion at the left should actively without pain" and "just trace right shoulder shrug and trace contraction of the posterior and lateral deltoid only." (TR 177). Dr. Davis recommended "electrodiagnostic studies to the right upper extremity for evaluation of residual nerve function," and "bracing to stabilize the glenohumeral joint and reduce traction" thereby reducing myofascial pain and protecting the shoulder. (TR 178). Dr. Davis also recommended psychological support and

possible medication for her depressed mood, evaluation and treatment of her chronic pain condition and normalization of her sleep pattern prior to being reassessed for vocational training for gainful employment. (TR 178). Dr. Davis further recommended that Plaintiff be instructed through rehabilitation to learn compensatory techniques for activities of daily living and to eventually pursue driving, including any necessary vehicle modification. (TR 178).

On February 2, 2004 Dr. Davis noted that Plaintiff has a sling for the purpose of reducing the amount of subluxation to the shoulder, but that Plaintiff had stopped wearing it due to appearance. (TR 171). Dr. Davis noted that Plaintiff indicated aching in her right upper back and described both her back pain and arm pain as a 10 out of 10, "despite the fact that she does not appear to be in any distress." (TR 171). Dr. Davis noted a "much improved" right side with "right shoulder flexion 80 degrees, 2+ strength and extension 1/5 at the shoulder." (TR 172). He further noted that her affect appeared better than at the prior evaluation and that she had no need for language translation by her sister. (TR 172). Plaintiff continued to indicate interest in pursuing Dr. Jebson's suggestion of arthrodesis to the glenohumeral joint for cosmesis and bicep rerouting to the forearm. (TR 171). Dr. Davis prescribed Neurontin and Elavil to relieve pain symptoms and to restore sleep. (TR 172). He further recommended physical and occupational therapies and stated that he would like to perform EMG and nerve conductions "to evaluate for residual nerve function." (TR 172).

On March 2, 2004 Dr. Davis noted that he had performed the EMG and concluded that "there is a poor prognosis for functional motor recovery." (TR 168, 169). On March 9, 2004 Dr. Davis examined Plaintiff upon completion of her first round of occupational therapy. (TR 165, 169). Dr. Davis noted that her sleep pattern was normalizing. (TR 166). He noted that Plaintiff ordered a

sling "to approximate the right glenohumeral joint to prevent traction on the musculature of the right upper extremity which is apparently causing most, if not all, of her pain symptoms." (TR 165). Dr. Davis also noted that it was time to initiate vocational training. (TR 165).

On April 6, 2004 Dr. Davis noted that Plaintiff was noticing improvement in her strength and shoulder girdle muscle functioning. (TR 162). He also noted that she was "much more upbeat." (TR 162). Plaintiff indicated that she was going to Hong Kong for about one month and would pursue vocational rehabilitation upon her return. (TR 162). Dr. Davis further noted that Plaintiff told him she "has been driving her sister's car with one hand and she has been doing fairly well." (TR 162). On May 4, 2004 Dr. Davis again noted that Plaintiff drives "and she is doing fairly well at it." (TR 160). He also noted that "[s]he is not wearing her sling" and that he suspects she doesn't wear it very often, if at all. (TR 160).

Dr. Davis examined Plaintiff on June 3, 2004 for pain in her ankle following exercises she was doing at home. (TR 157). Dr. Davis diagnosed "right ankle strain with lateral ankle pain and mild edema." (TR 158). An x-ray confirmed that there was no acute fracture or dislocation and revealed an "[o]ld avulsion fracture or accessory ossicle near the tip of the lateral malleolus." (TR 159). On June 9, 2004 Dr. Davis noted that the Plaintiff's right ankle strain was improving. (TR 155). On July 30, 2004 Dr. Davis noted that Plaintiff had been "non compliant with wearing her shoulder girdle brace and sling" and that her symptoms had been worsening since her last visit. (TR 154). He also noted that she initially pursued vocational rehabilitation services but did not receive a call back and therefore did not pursue it further. (TR 153). He attributed Plaintiff's lack of interest to fear and a concern about her appearance in public. (TR 153). On August 31, 2004 Dr. Davis noted that Plaintiff still had myofascial pain affecting her shoulder girdle, however, it

appeared to be fairly well controlled. (TR 151). He further noted that Plaintiff had been wearing the right shoulder girdle brace, although probably not as often as she should. (TR 151). He again concluded that Plaintiff "has not been fully compliant with the use of the shoulder girdle splint." (TR 152). Dr. Davis stated that Plaintiff "is not interested in looking for a job at this time" but that she would like to go back to school. (TR 151).

Although Plaintiff's claim for benefits and her Disability Reports do not allege problems with depression, Plaintiff obtained treatment from Macomb County through Community Mental Health from November 22, 2004 through April 19, 2005. (TR 179-208). Plaintiff was seen for an initial assessment on November 22, 2004. (TR 208). She attended a follow-up session on December 3, 2004 and reported that her mood had been "OK" and that she had stopped using marijuana as agreed at the initial assessment. (TR 206). Plaintiff attended these sessions accompanied by her friend Marilyn. (TR 208). Plaintiff missed her scheduled psychiatric evaluation on December 10, 2004. (TR 203). At the December 28, 2004 session Plaintiff expressed thoughts of suicide and reported a prior suicide attempt in Hong Kong. (TR 203). The Progress Notes indicate a "no show, no call for scheduled therapy" on January 3, 2005. (TR 200). On February 23, 2005 the Progress Notes for February 23, 2005 note a call from Plaintiff indicating that she was in Hong Kong and would return on March 14, 2005. (TR 198). Plaintiff attended a therapy session on March 22, 2005 and the Progress Notes note that Plaintiff "reported she ran out of medication in Hong Kong . . . and 'I feel fine without it.'" (TR 197). Progress Notes from April 4, 7 and 12, 2005 note that Plaintiff rescheduled appointments because she was in Toronto. (TR 194-96).

On April 19, 2005 Plaintiff attended therapy to complete a Plan of Service. (TR 187). According to Progress Notes from the April 19, 2005 session, Plaintiff "reported 'No depression'

since her trip to Hong Kong to see her mother . . .and that her sleep is good." (TR 187). Plaintiff was not on any psychotropics at that time. (TR 187). A Physician's Note dated June 14, 2005 noted "Zoloft helping her depression." (TR 212).

### *Vocational Expert Testimony*

Vocational expert ("VE") Dr. Elaine Trippi testified at the June 30, 2005 administrative hearing. (TR 248). The VE testified that she considered Plaintiff's prior work as a waitress to be light, semiskilled and that she does not believe Plaintiff has transferable skills to sedentary work. (TR 249). The ALJ posed two hypothetical questions to the VE asking if such a person could be expected to perform Plaintiff's past relevant work. (TR 250). The VE responded to each hypothetical that a person with such limitations would not be able to perform Plaintiff's past relevant work as a waitress. (TR 250).

## ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since the date of her application, and suffered from right brachial plexopathy, depression, and a history of substance abuse, all severe impairments, she did not have an impairment that met or equaled the Listing of Impairments. (TR 29). Additionally, the ALJ found Plaintiff's testimony was not totally credible, found she could not perform her past relevant work, found that her exertional limitations do not allow her to perform the full range of sedentary work, but concluded that she was capable of performing a significant number of sedentary jobs in the economy. (TR 29). Therefore she was not suffering from a disability under the Social Security Act. (TR 29).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this court to try cases *de novo*, or resolve conflicts in the evidence, or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**DISCUSSION AND ANALYSIS**

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) she was not presently engaged in substantial gainful employment; and

(2) she suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987).

### *ALJ's Findings Relating to Listing 1.07*

The ALJ concluded that Plaintiff's impairments do not meet or equal any section in the listing of impairments. (TR 29). Plaintiff argues that her medical condition meets or equals Listing 1.07 because she did not obtain functional use of her right upper extremity after six surgical procedures. The criteria for listing § 1.07, fracture of an upper extremity, requires the following:

> [F]racture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt 404, Subpt. P, App. 1 § 1.07. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

Listing 1.07 requires the "non-union of a fracture." A non-union is a "failure of the ends of a fractured bone to unite." Dorland's Illustrated Medical Dictionary 1019 (24th ed. 1965). Following Plaintiff's accident in 1998 resulting in fractures of her right radius and ulna, she underwent fixation of the fracture with plate and screw. (TR 144, 145). There is no indication in the record that the fractures were not healed with this fixation and Plaintiff does not point to any evidence that the fractures have not healed. The ulnar plate was removed on June 17, 2002. (TR 145). On August 28, 2003 Dr. Jebson noted that x-rays of Plaintiff's forearm "revealed a healed both bone forearm fracture." (TR 150). At the hearing, Plaintiff testified that she also suffered a fracture to her left wrist from the accident and that fracture has healed. (TR 245). Therefore, the record does not show that Plaintiff's injury constituted "non-union" of a fracture. The ALJ's determination that Plaintiff's injuries did not meet Listing 1.07 is supported by substantial evidence in the record.

### *ALJ's Findings Relating to a Significant Number of Jobs in the Economy and Plaintiff's Credibility*

Plaintiff next argues that the ALJ's finding that there are a number of jobs in the national economy that Plaintiff could perform is not supported by substantial evidence. The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform unskilled sedentary work, as defined by the regulations and with the following specific functional limitations:

> can lift and carry five pounds frequently, ten pounds occasionally with her left upper extremity; can push/pull with her left upper extremity within the aforementioned weight limits; can occasionally reach with her right upper extremity; is completely

precluded from climbing; should avoid concentrated exposure to working around hazards; and can perform simple job assignments with routine production and stress."

(TR 29). A sedentary job involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools" and sitting, however occasional walking and standing is often necessary. 20 C.F.R. § 416.967(a).

In a Medical Examination Report dated July 17, 2003 Dr. Wiater noted that Plaintiff has the following physical limitations: (1) limited to lifting and/or carrying up to ten pounds occasionally; (2) able to stand, sit and/or walk eight hours in an eight-hour workday; and (3) able to use her left extremity for repetitive actions including simple grasping, reaching, pushing/pulling and fine manipulating. (TR 147-48). Dr. Wiater further noted that Plaintiff has no mental limitations. (TR 148).

The record also contains a Physical Residual Functional Capacity Assessment dated August 18, 2003 by examiner Barbara B. Kirkland noting the following exertional limitations: (1) Occasionally lift and/or carry twenty pounds one-handed; (2) frequently lift and/or carry ten pounds one-handed; (3) stand and/or walk for about six hours in an eight-hour work day; (4) sit for a total of about six hours in an eight-hour workday; and (5) ability to push and/or pull (including the operation of hand and/or foot controls) is limited in right upper extremity. (TR 136-43). The examiner further noted that Plaintiff should "never" climb ramps, stairs, ladders, ropes or scaffolding and is limited in her ability to reach and handle with her right upper extremity. (TR 138, 139). The examiner advised that Plaintiff should avoid concentrated exposure to hazards including machinery and heights. (TR 140). The ALJ's findings with regard to Plaintiff's RFC are supported by both

of these reports. The ALJ's determination of Plaintiff's RFC is supported by substantial evidence in the record.

The ALJ further found that there are a significant number of jobs in the national economy that Plaintiff could perform, including "unskilled sedentary inspector and sorter jobs numbering 3,000 in southeastern Michigan and 6,000 in the state of Michigan." (TR 29).

The ALJ asked the VE a series of hypothetical questions incorporating exertional and nonexertional limitations and Plaintiff's claimed limitations. (TR 250-52). In response to this line of questioning the VE testified that taking Plaintiff's age, education and work experience and the non exertional limitations of no climbing and avoiding concentrated exposure to hazards, at the unskilled level at benchwork, with a lifting restriction of maximum ten pounds and lighter weights more frequently, there would be approximately 3,000 similar types of jobs to visual inspector, sorter and hooker in the Detroit area and twice that number of jobs in the state. (TR 251). The VE further testified that if she found Plaintiff's testimony to be credible and the exertional impairments supported by the medical evidence, Plaintiff's work would be limited sedentary activity that would require a sit stand option. (TR 251). The VE testified that this would lower the base of previously described jobs to approximately 1500 in the Detroit area and 3,000 for the state. (TR 251). The VE further responded that her responses were consistent with the DOT to the best of her knowledge. (TR 252).

The RFC which the ALJ determined for Plaintiff does not include a sit/stand option and therefore the lower job base does not apply. Furthermore, the ALJ found some of Plaintiff's testimony regarding her limitations only partially credible. (TR 26). In a hypothetical question posed to the vocational expert, an ALJ is required to incorporate only those limitations which he

finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters,* 127 F.3d at 531. However, credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* Furthermore, an ALJ's credibility determination must contain "specific reasons" that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p.

The ALJ found Plaintiff's subjective complaints regarding neck, back and knee pain not fully credible. (TR 27). The ALJ identifies specific evidence, and lack of evidence which supports his conclusions regarding Plaintiff's credibility in these areas, including evidence of Plaintiff's noncompliance with wearing the shoulder girdle splint, designed to ease her pain. (TR 27, 152, 154). The ALJ further notes that the record does not substantiate complaints or treatment of knee pain. (TR 27).

Similarly, the ALJ noted specific reasons and evidence in the record which cast doubt upon Plaintiff's subjective complaints about her mental health including insomnia and depression. (TR 27). The ALJ notes that Plaintiff did not follow through with her mental health counseling and medication and Plaintiff reported that she stopped taking her psychotropic medications and medications to help her sleep shortly after they were prescribed, yet she remained stable. (TR 27, 187, 197). Substantial evidence in the record supports the ALJ's credibility determinations.

The ALJ's finding that there are a significant number of jobs in the national economy which Plaintiff can perform is supported by substantial evidence in the record including the VE's testimony in response to an accurate hypothetical based on Plaintiff's RFC.

*<u>New Evidence in the Record</u>*

The ALJ determined that Plaintiff's depression was not a severe impairment based on substantial evidence in the record, including the credibility determinations discussed above. However, Plaintiff argues that her case should be remanded for further assessment of her mental limitations and abilities in light of an evaluation by Sarath Hemachandra, M.D. on December 7, 2005 in which Dr. Hemachandra noted that Plaintiff had intensifying depressive symptoms. (TR 232). Dr. Hemachandra's psychiatric evaluation was not before the ALJ at the time the ALJ rendered his written opinion and the Appeals Council denied Plaintiff's request for review. Consequently, the Court cannot consider these documents in determining whether substantial evidence supports the ALJ's non-disability determination. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Similarly, the record contains two Medical Source Statements Concerning the Nature and Severity of an Individual's Physical Impairment completed by C. Wessel, M.D. on January 9, 2006 and a Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment completed by Dr. Hemachandra on February 1, 2006. (TR 217-31).

The Court may remand the case to the ALJ to consider this additional evidence "but only upon a showing that the evidence is new and material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). This is referred to as a "sentence six remand" under 42 U.S.C. § 405(g). *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 549 (6th Cir. 2002). The

party seeking remand has the burden of showing that it is warranted. *See Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). "A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (citing *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (6th Cir. 1984) (per curiam). "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d 709, 711 (6th Cir. 1988) (citing *Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)).

Consideration of the information before the Court leads this Court to conclude that a remand based upon this evidence would not be warranted. The evidence is new because it was created after the ALJ rendered his decision and Plaintiff has not shown "good cause". *See Oliver v. Sec'y of Health & Human Srvs.*, 804 F.2d 964, 966 (6th Cir. 1986). More importantly, the new evidence presented by Plaintiff is not "material". The exact nature of Dr. Hemachandra's or Dr. Wessel's treatment relationship with Plaintiff is unknown, so it is not clear that their opinions are entitled to any deference. *See* 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(d)(2); *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992). Based upon the foregoing, the Court concludes that a sentence six remand for consideration of new evidence is not warranted in this case.

## **CONCLUSION**

The ALJ's opinion is supported by substantial evidence. Defendant's Motion for Summary Judgment (docket no. 9) should be granted, that of Plaintiff denied and the instant complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: January 11, 2008                    s/ Mona K. Majzoub
                                           MONA K. MAJZOUB
                                           UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

       I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: January 11, 2008                        <u>s/ Lisa C. Bartlett</u>
                                                Courtroom Deputy